UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
LISA A. HOLLIDAY, *pro se*,                                    :
                                                               :
                          Plaintiff,                           :
                                                               :    **MEMORANDUM AND ORDER**
                 -against-                                      :    05-CV-1826 (DLI) (VVP)
                                                               :
                                                               :
MICHAEL J. ASTRUE[1]                                           :
Commissioner of Social Security,                               :
                                                               :
                          Defendant.                           :
------------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

    Plaintiff Lisa A. Holliday, *pro se*, filed an application for supplemental security income

("SSI") under the Social Security Act (the "Act") on May 20, 2002. Plaintiff's application was

denied initially and on reconsideration. Plaintiff appeared without representation and testified at a

hearing held before an Administrative Law Judge ("ALJ") on September 21, 2004 (the

"Hearing"). By decision dated November 3, 2004, the ALJ concluded that Plaintiff was not

disabled within the meaning of the Act. On February 11, 2005, the ALJ's decision became the

Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.

Plaintiff filed the instant action, *pro se*, seeking judicial review of the denial of benefits, pursuant

to 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner now moves for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits. Plaintiff

did not file an opposition to the instant motion, and, after providing Plaintiff with a final warning

to respond, on October 12, 2007, the court deemed the motion unopposed.

    For the reasons set forth more fully below, the Commissioner's motion is denied. The

court finds that the ALJ did not properly develop the record in determining that the severity of

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo Anne B. Barnhart as
the defendant in this action.

Plaintiff's impairments did not meet or equal the criteria of any listed impairment in Appendix 1, Subpart P of 20 C.F.R. § 404 (the "Appendix"). The ALJ further improperly weighed the medical source opinions and made findings concerning Plaintiff's residual functional capacity based on an unsupported determination that Plaintiff's claims were not entirely credible. The ALJ's findings are thus not supported by substantial evidence. As such, the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

### A.   Non-medical and Testimonial Evidence

Plaintiff was born on December 18, 1959, and attended school through the eleventh grade. (Administrative Record ("R") at 48, 58, 144.) She worked as a receptionist until 1978 and, thereafter, worked as a babysitter. (R. 53, 68, 145.) Plaintiff currently lives with her nephew, his girlfriend, and their two children. She claims to have become disabled on December 31, 1999. (R. 48.)

Plaintiff was approximately two hours late to the Hearing (R. 140-41), which was conducted via remote conferencing equipment before an ALJ located in Virginia (R. 157). She admitted to having had "a beer" prior to her arrival (R. 152). She indicated that she drank regularly and once sought detoxification treatment. (R. 148.) Plaintiff testified that she suffers from chest pain, asthma, and eczema that makes her skin look "all burnt up." (R. 147.) In particular, Plaintiff indicated that the eczema causes her tremendous discomfort—"I itch so much, sometimes, I've got to go to the hospital to get a shot because . . . the pills and stuff do not help. Sometimes I feel like jumping out of a window . . . that's how bad I be [sic] itching. I wake up bleeding . . . ." (R. 148.) Plaintiff notes that the eczema causes swelling in her extremities and

can trigger asthma attacks. (R. 150.) Plaintiff also attests to being afflicted by anemia (R. 156), a serious heart condition (R. 149-150), and pancreatitis due to alcohol abuse (R. 151).

With respect to her residual functions, Plaintiff testified that she can lift a gallon of milk (which weights eight or nine pounds) and thought she might be able to lift up to twenty pounds. (R. 146.) Plaintiff, who takes daily naps (R. 153-54), further testified she has difficulties standing, walking, and taking stairs up and down, and must use a cane when she walks lest her legs "give out" unexpectedly. (R. 145.) She cannot ambulate short distances of a block or two, especially in bad weather, or walk up and down stairs, without pausing or sitting down. (R. 145, 150.) Plaintiff testified that she has broken her legs twice. At the Hearing, she also indicated that her legs felt "wobbly" due to walking up the stairs at the train station as part of her commute. (R. 149.) Plaintiff also stated that she cannot sit for more than an hour without "shifting around." (R. 146.)

**B.      Vocational Evidence**

Miriam Greene, a vocational expert, testified at the Hearing that, based solely on the Social Security Administration's assessment of Plaintiff's background, education, and health restrictions, Plaintiff can perform jobs at "the light and sedentary level." (R. 155.) However, Ms. Greene concluded that, if Plaintiff's claims were credited in their entirety, even sedentary work would be beyond Plaintiff's capacity for three reasons. (*Id.*) First, Plaintiff's need to nap during the day would detract from her ability to work for the typical eight-hour work day. (*Id.*) Second, Ms. Greene testified that the itching and the chest pains would disrupt Plaintiff's concentration and work pace. (*Id.*) Finally, Ms. Greene indicated that many sedentary jobs require academic skills that surpass the Specific Vocational Preparation ("SVP") required for the

work that Plaintiff has performed in the past.  (*Id.*)  These factors led Ms. Greene to conclude that, if Plaintiff's testimony were credited, and under all the circumstances, Plaintiff could not perform sedentary work.  (R. 154-55.)

**C.    Medical Evidence**

Plaintiff's medical evidence obtained prior to filing her application reflects sporadic treatment at Coney Island Hospital ("Hospital") for various injuries and conditions.  Plaintiff visited the Hospital in 1995 and 1996 for pharyngitis, muscle pain, a right breast biopsy, and a right hand injury.  (R. 97-101, 130.)  Plaintiff visited the Hospital in 1999 and 2000 for chest and epigastric pain, a left ankle fracture, gynecological complaints, anemia, shortness of breath, and a skin rash.  (R. 93-94, 96, 103, 108, 132-33.)  Several records indicate that Plaintiff was an alcoholic.  (R. 100-101.)

In July 2000, Plaintiff underwent diagnostic testing.  The results of an ECG were abnormal for left atrial enlargement, left ventricular hypertrophy, and nonspecific T-wave abnormalities.  (R. 106.)  An X-ray of her chest indicated cardiomegaly.  (R. 107.)  An echocardiograph showed obstructive cardiomegaly with preserved left ventricle functioning and mild mitral regurgitation.  (R. 109.)  In October 2000, Plaintiff visited Dr. Melendez, a physician at the Hospital, complaining of chest pain, shortness of breath, eczema, and swollen feet.  (R. 91, 134.)  He referred her to dermatology and cardiac services and prescribed Atarex for the chronic eczema.  (R. 134-35.)

In Spring 2002, around the time Plaintiff filed her application, she began to seek more frequent treatment.  On March 14, 2002, Plaintiff visited Dr. Melendez complaining of shortness of breath and itchy skin.  (R. 88.)  Dr. Melendez noted from the alcohol on her breath that she was

intoxicated. (*Id.*) His examination also revealed an enlarged liver, a systolic heart murmur, and hyperpigmentation of the entire body with lichenification. (*Id.*) He diagnosed her with atopic dermatitis and congestive heart failure. (*Id.*) He recommended that she consult with a dermatologist and prescribed Fursosemide for the atopic dermatitis. (*Id.*) On March 22, 2002, she returned, complaining again of itchy skin. Dr. Melendez noted that Plaintiff had an infected lesion in her leg from scratching through the night. He again recommended that she consult with a dermatologist. (R. 86.) On April 19, 2002, Dr. Melendez diagnosed Plaintiff with hypertrophic obstructive cardiomyopathy. (R. 85.) On May 24, 2002, Plaintiff visited a dermatologist, who diagnosed her with generalized atopic dermatitis and prescribed Kenolog and an ointment. (R. 84.)

On July 31, 2002, Dr. Ebrahim Sadighim examined Plaintiff at the request of the New York State Department of Health. (R. 111-13.) Plaintiff reported a history of anemia, pancreatitis, body edema, shortness of breath, palpitations, and alcohol abuse. (R. 111.) Plaintiff indicated that she took several prescription medications, including Diltiazem, thiamine, Celebrex, and hydroxyzine. (*Id.*) Dr. Sadighim diagnosed Plaintiff with congestive heart failure. (R. 112.) He indicated that she had moderately limited ability to lift, carry, push, or pull, mildly limited ability to stand or walk, and no limitations with respect to sitting. (R. 112-113.)

On August 21, 2002, Dr. Bernard Weiss, a state agency physician, reviewed Plaintiff's medical records. He concluded that she was capable of performing sedentary work. (R. 117.)

Dr. Melendez, Plaintiff's treating physician, examined her on October 3, 2002. During this examination, Plaintiff indicated that her heart was racing and admitted that, for the last twenty-three years, she drank a pint of vodka daily. (R. 136.) He diagnosed her with alcohol

abuse, congestive heart failure, and atopic dermatitis.  (*Id.*)  He prescribed Furosemide, thiamine, folic acid, Elidel, hydroxyzine, magnesium chloride, and Diltiazem.  (*Id.*)

During the hearing, Plaintiff submitted a Diagnostic Status Report from the Wellness Program at HS Systems.  (R. 128.)  The record does not indicate the basis for this Diagnostic Status Report, nor does it indicate when and by whom it was completed.  The Diagnostic Status Report indicates that Plaintiff has been diagnosed with "Abnormal EKG" and "Chest pain, unspecified," and that she is undergoing a one to three-month rehabilitation plan for these conditions, which are identified as "not controlled."  (*Id.*)  The report further lists "Contact dermatitis and other ezema," "Hypertension," and "Asthma without mention of status" as conditions that are either "controlled, or have reached maximum medical improvement with treatment and these conditions should not interfere with the client's ability to work."  (*Id.*)

## DISCUSSION

### A.  Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their  benefits  "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. §§ 405(g), 1383(c)(3).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human*

*Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJ's, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

**B.      Determining Disability**

To receive disability benefits, Plaintiff must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Plaintiff establishes disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id*. § 423(d)(1)(A). Plaintiff bears the initial burden of proof on disability

status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether Plaintiff is disabled under the Act as set forth in 20 C.F.R. § 416.920. If at any step, the ALJ makes a finding that Plaintiff is either disabled or not disabled, the inquiry ends there. First, Plaintiff is not disabled if she is working and performing "substantial gainful activity." 20 C.F.R. § 416.920(b). Second, the ALJ considers whether Plaintiff has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 416.920(c). Third, the ALJ will find Plaintiff disabled if her impairment meets or equals an impairment listed in Appendix 1. 20 C.F.R. § 416.920(d). If Plaintiff does not have a listed impairment, the ALJ makes a finding about Plaintiff's "residual functional capacity" ("RFC") in steps four and five. 20 C.F.R. § 416.920(e). In the fourth step, Plaintiff is not disabled if she is able to perform "past relevant work." 20 C.F.R. § 416.920(e). Finally, in the fifth step, the ALJ determines whether Plaintiff could adjust to other work which exists in the national economy, considering factors such as age, education, and work experience. If so, Plaintiff is not disabled. 20 C.F.R. § 416.920(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that Plaintiff could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642).

**C.    ALJ's Determination**

The ALJ found the first step in Plaintiff's favor, noting that she had not worked since filing her application.  (R. 12, 16.)  The ALJ resolved the second step in Plaintiff's favor, finding that her impairments were severe.  (R. 13, 16.)  The ALJ resolved the third step against Plaintiff, finding that her impairments did not meet or equal the requirements of a listed impairment.  (R. 13, 16.)  The ALJ resolved step four against Plaintiff, finding that she retained the RFC to perform sedentary work and noting that she no past relevant work experience.  (R. 14-15.)  The ALJ resolved step five against Plaintiff, relying on the Medical-Vocational Guidelines to determine that Plaintiff could perform work available in the national economy.  (R. 15.)

**D.    Analysis**

The Commissioner moved unopposed for affirmation of the denial of benefits.  As a *pro se* litigant, Plaintiff's pleadings are held to "less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Accordingly, the court will construe Plaintiff's pleadings and papers "to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*emphasis omitted*).

**1.    Duty to Develop the Record**

The court finds that the ALJ failed to adequately develop the record when concluding, at step three, that "the severity of the claimant's impairments does not meet or equal the criteria of any listed impairment" in Appendix 1.  (R. 13.)  An "ALJ, unlike a judge in a trial, must himself affirmatively develop the record."  *Echevarria,* 685 F.2d at 755 (citations omitted).  When a claimant appears at a hearing *pro se*, ALJs are under a heightened duty "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Hankerson v.*

*Harris*, 636 F.2d 893, 895 (2d Cir. 1980). With respect to treating physicians, ALJs must seek additional evidence or clarification when a report "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R § 404.1512(d); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).

The record indicates that Plaintiff's application is based in part on impairments that could be severe enough to warrant a finding of disability under Section 4.06 and 8.05 of the Appendix. The ALJ failed to adequately discharge his heightened duty to this *pro se* litigant in assessing whether her ailments warranted a *per se* finding of disability under Apendix 1.

### a. Cardiomegaly

The ALJ did not make findings of fact sufficient to ascertain whether Plaintiff meets the severity criteria with respect to her cardiovascular condition as set forth in Appendix 1, Section 4.08. Under Section 4.08, plaintiffs diagnosed with cardiomegaly are disabled if their impairment is complicated by criteria set forth in Section 4.02, *inter alia*, which includes "documented cardiac enlargement by appropriate imaging techniques (e.g., a cardiothoracic ratio of greater than 0.50 on a PA chest x-ray with good inspiratory effort or left ventricular diastolic diameter of greater than 5.5 cm on two-dimensional echocardiography), resulting in inability to carry on any physical activity, and inadequate cardiac output, pulmonary congestion, systemic congestion, or anginal syndrome at rest (e.g., recurrent or persistent fatigue, dyspnea, orthopnea, anginal discomfort)."

Plaintiff's medical records show that she was diagnosed with obstructive cardiomegaly in July 2000. (R. 107). The records further document cardiac enlargement. For instance, the July

21, 2000 X-rays show that "cardiac size is enlarged" (R. 107), while the July 24, 2000 ecocardiograph was abnormal for left atrial enlargement and left ventricular hypertrophy (R. 106, 109). An EKG performed by Dr. Sadighim on July 31, 2002 shows left ventricular hypertrophy. (R. 115-16, 112.) According to the Diagnostic Status Report submitted by Plaintiff at the hearing, Plaintiff suffers from uncontrolled cardiovascular diseases that result in abnormal EKGs and chest pain and require further treatment. (R. 128.)

Moreover, Plaintiff's resulting inability to engage in physical activity appears to be well documented—Dr. Sadighim's report indicates that Plaintiff experienced shortness of breath and palpitation that is exacerbated by walking or working (R. 111), and, in fact, Plaintiff has been complaining of chest pain, shortness of breath, and persistent fatigue since at least 1999. (*See, e.g.*, R. 103 (reflecting chest and epigrastic pain in December 1999); R. 88 (reflecting complaints on March 14, 2002, of shortness of breath when she climbed stairs); R. 85 (noting that on, April 19, 2002, Plaintiff complained of chest discomfort that limited her ability to walk one or two blocks).) Finally, Dr. Sadighim found that Plaintiff has three-pillow orthopnea. (R. 111.) Accordingly, Plaintiff's cardiomegaly may be consistent with the disability criteria in Appendix 1, Sections 4.02 and 4.08.

However, the court is unable to determine from the record whether Plaintiff still suffers from cardiomegaly, or whether treatment corrected her condition after her diagnosis in July 2000. If, on remand, it is determined that Plaintiff still suffers from cardiomegaly, the record may support a finding of disability at the third step of the relevant analysis.

### b. Atopic Dermatitis

Under Section 8.05, plaintiffs diagnosed with atopic dermatitis are *per se* disabled if they

are afflicted with "extensive skin lesions that persist for at least 3 months despite continuing treatment as prescribed." The severity of atopic dermatitis is assessed based on "the extent of your skin lesions, the frequency of flare-ups of your skin lesions, how your symptoms (including pain) limit you, the extent of your treatment, and how your treatment affects you." 20 C.F.R. § 404, Subpart P, Appendix 1, Section 8.00(c).

Plaintiff has been diagnosed with chronic eczema and atopic dermatitis resulting in skin lesions in the form of lichenification[1] and excoriation[2] since at least 2000.[3] (*See* R. 92 (medical record dated July 24, 2000, reflecting admission to Coney Island Hospital for evaluation of skin lesions); R. 87 (medical record dated March 9, 2002, reflecting treatment at the Coney Island Community Health Center for an excoriated lesion on Plaintiff's left calf, close to the knee); R. 88 (medical records dated March 14, 2002, reflecting treatment for total body hyperpigmentation and lichenification); R. 86 (medical record dated March 22, 2002, reflecting treatment for multiple infected excoriations on Plaintiff's left calf, close to the knee).)

The record reflects that Plaintiff's lesions may have persisted for over three months despite continuing treatment as prescribed by Plaintiff's treating physicians. (*See* R. 84, 86-87, 89-92 (showing that Plaintiff repeatedly solicited refills on her prescribed medication or sought additional treatment for the atopic dermatitis and chronic eczema). During a consultation

---

[1] Merriam-Webster's Medical Dictionary defines "lichenification" as "the process by which skin becomes hardened and leathery or lichenoid usually as a result of chronic irritation" or "a patch of skin so modified." *Lichenification*, MERRIAM-WEBSTER'S MED. DICTIONARY, *available at* http://www.merriam-webster.com/medical/lichenification (last visited on April 30, 2009).

[2] "Excoriation" is "the act of abrading or wearing off the skin," or "a raw irritated [skin] lesion." *Excoriation*, MERRIAM-WEBSTER'S MED. DICTIONARY, *available at* http://www.merriam-webster.com/medical/excoriation (last visited on April 30, 2009).

[3] Lichenification and excoriation are "secondary lesions" which are "changes in the skin that result from primary skin lesions, either as a natural progression or as a result of a person manipulating (e.g., scratching or picking at) a primary lesion." Bridget Travers, *Skin Lesions*, GALE ENCYCLOPEDIA OF MEDICINE (2002), *available at*, http://www.healthline.com/galecontent/skin-lesions (last visited on April 30, 2009).

conducted on May 24, 2002, after Plaintiff had applied for SSI benefits, Plaintiff's doctor noted generalized hyperpigmentation and lichenification on her face, arms, legs, and trunk, along with excoriations on her legs, that had not been alleviated by creams or pills. (R. 84.) Plaintiff repeatedly alluded to her lesions during the Hearing before the ALJ and elicited verbal confirmation regarding her condition from the Vocational Examiner who was present at the Hearing. (*See, e.g.*, R. 147-48, 150.)[4]

The record further reveals that Plaintiff's physician found that atopic dermatitis caused edema in her legs (R. 87), apparently making it very painful for Plaintiff to walk. (R. 151.) Plaintiff indicates that she must walk with a cane "because I could be walking and a pain will shot [sic] up my leg and I will fall down." (R. 66.) Dr. Sadighim, who evaluated Plaintiff at the request of the agency, noted 2+ pretibial edema and reported that Plaintiff claimed to avoid heavy shopping in part due to leg pain. (R. 111.) Similarly, Dr. Bernard Weiss, a state agency physician, reviewed the record and found that Plaintiff's allegation that her leg condition results in difficulty ambulating is "credible." (R. 124.)

Notwithstanding this evidence, the record regarding the severity of Plaintiff's atopic dermatitis was not fully developed. First, neither of the physicians consulted by the agency addressed the severity of Plaintiff's atopic dermatitis. Indeed, neither Dr. Sadighim nor Dr. Weiss made any mention of lesions on Plaintiff's skin.

Second, during the hearing, Plaintiff submitted a Diagnostic Status Report from HS Systems, which listed, *inter alia* and in relevant part, contact dermatitis and other eczema as one of several "controlled and stable conditions" which "should not interfere with the client's ability

---

[4] As the ALJ presided over the hearing from Virginia by teleconferencing equipment, the court cannot determine if the ALJ was able to make any kind of visual assessment of Plaintiff's condition.

to work." (R. 128.) The record does not indicate the basis or context for this Diagnostic Status Report, or whether it was completed by a treating physician. The ALJ made no effort to ascertain exactly what Plaintiff had submitted, or to determine what weight should be afforded to the report. (R. 149-50.)

Third, and most importantly, because the ALJ conducted the Hearing remotely (R. 157), he could not have observed whether Plaintiff still exhibited lesions, nor did he ask any questions pertaining to the existence and severity of lesions. The ALJ failed to develop the record with respect to the onset, duration, frequency of flare-ups, and prognosis for Plaintiff's skin disorder. There were no questions or testimony regarding the location, size and appearance of the lesions, or about the degree to which the atopic dermatitis affects Plaintiff's mobility. Thus, the court finds that the ALJ failed to sufficiently develop the record.

### 2. Treating Physician Rule

The court also finds that the ALJ improperly weighed the medical source opinions. The ALJ's finding that Plaintiff's impairments are not sufficiently severe to meet the criteria of any impairment listed in Appendix 1 is based in part on the opinions of state agency medical consultants who evaluated the issue. (R. 13.) Here, contrary to the opinion of Plaintiff's treating physicians, who appear to have determined that Plaintiff's chronic eczema caused her edema, Dr. Sadighim attributed Plaintiff's pretibial edema to congestive heart failure and ruled out other causes of edema. (R. 112.)

A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.

*Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993) (*citing* 20 C.F.R. 404.1527(d)). When a treating source's opinion is not given *controlling* weight, the proper weight accorded depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). Additionally, the ALJ must always "give good reasons" in her decision for the weight accorded to a treating source's medical opinion. *Id.* There are, however, certain decisions reserved to the Commissioner. Such decisions include the determination that a Plaintiff is "disabled" or "unable to work." 20 C.F.R. § 404.1527(e)(1). "That means that the Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the Plaintiff is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

In contemplating Plaintiff's disability, if the ALJ had given more weight to the treating sources, he at least would have found it necessary to seek further information from Plaintiff's treating physicians concerning the causes and effect of her edema. *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282 (E.D.N.Y. 2005) (remanding as the ALJ failed to accord proper weight to treating source opinion because he found them inconsistent with a state agency doctor's report). However, the ALJ did not develop the record sufficiently in this regard.

### 3. Residual Functional Capacity

In concluding that Plaintiff retained the residual functional capacity to perform sedentary work, the ALJ determined that Plaintiff's allegations regarding her limitations "are not totally

credible." (R. 16.) Residual functional capacity ("RFC") is the most that a person can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). The court finds that the ALJ provided no sound reason to conclude that Plaintiff's testimony about her symptoms were "not totally credible," and, accordingly, his conclusion regarding Plaintiff's RFC is invalid.

The ALJ described "claimant's allegations regarding her limitations" as "generally credible" in the body of the opinion, and found that "the evidence documents that the claimant has impairments which could be expected to cause some of the pain and limitations alleged . . . ." (R. 14.) He nevertheless found that her complaints were "not totally credible," because "the record reveals nothing to support the claimant's contention that her impairments are debilitating and prevent her from performing all work activity." (*Id*.) He also argued that his credibility finding was justified in light of Plaintiff's ability to "shop," "perform household chores," and "take[] care of all her personal needs." (*Id.*) The court finds that neither Plaintiff's lifestyle nor the objective medical evidence provides sufficient grounds for disbelieving Plaintiff's testimony about her symptoms.

It is well established that a Plaintiff "need not be an invalid in order to be found disabled under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1992). Here, Plaintiff does not claim that she is totally disabled. Plaintiff testified that her heart condition leaves her severely fatigued after minor exertion (R. 145, 151, 153), and she requires daily naps (R. 153-54). She reports shortness of breath and worsening palpitation with walking or working. (R. 153.) Even with a cane, Plaintiff can walk only a block or two without stopping (R. 145), and reports that her skin is severely irritated by exposure to sunlight because of her chronic eczema

(R. 65).  Her skin condition also results in itching, pain in her extremities, and open sores that often bleed.  (R. 66, 148.)

The evidence of her lifestyle is not inconsistent with these limitations.  Plaintiff indicates that her pain has affected "everything that I've ever done before I became sick," including "walking, playng ball, eating, taking care of children, especially my grand[children]."  (R. 67.) At the hearing, she testified that she was not sure how long she could stand, but that she uses a cane because "I don't know when my legs going [sic] to give out."  (R. 145-46.)  She also testified that she cannot sit for more than an hour without "shifting around."  (R. 146.)  Plaintiff states that "I itch so much, sometimes, I've got to go to the hospital to get a shot because . . . the pills and stuff don't help.  Sometimes I feel like jumping out a window . . . I wake up bleeding . . .."  (R. 148.)  According to Dr. Sadighim, Plaintiff "does not do heavy shopping because of leg pain and shortness of breath."  (R. 111.)  She dresses herself, but "does self-medicate."  (*Id.*)  This evidence, which sheds light on the quality and frequency of Plaintiff's day-to-day activities, highlight, rather than undermine, the severity of her limitations.

The medical record from the onset of her alleged disability on December 31, 1999 supports Plaintiff's claims.  For instance, the record from her treating physicians indicates that she has lesions on her face, arms, legs and trunk, some of which appear prone to infection.  (R. 84, 86-88, 90, 92.)  Her physicians also note that she has swollen legs or edema (R. 87, 91, 136), which was corroborated by agency's consulting physicians (R. 111-12, 120), and difficulties walking more than one to two blocks or using stairs (R. 67, 85, 88).  Her cane was ordered by a prescription from her doctor.  (R. 85, 135.)  Plaintiff's medical record reflects treatment for her heart condition, whose symptoms include chest pain and discomfort, and shortness of breath.  (R.

85, 88, 91, 132, 134.)  Significantly, Dr. Weiss, the state agency doctor, found that Plaintiff's allegations "are credible."  (R. 124.)

Furthermore, the ALJ's finding that the "the record reveals nothing to support [Plaintiff]'s contention that her impairments are debilitating and prevent her from performing all work activity" is belied by her own concession that "the evidence documents that [Plaintiff] has impairments which could be expected to cause some of the pain and limitations alleged," and that "[Plaintiff]'s allegations regarding her limitations" are "generally credible."  (R. 14.)  Vocational Expert Miriam Greene testified at the Hearing that if Plaintiff's claims were credited in their entirety, even sedentary work would be beyond Plaintiff's capacity because Plaintiff's need to nap during the day would detract from her ability to work for a full work day.  Furthermore, Ms. Greene explained that Plaintiff's itching and chest pain would disrupt her concentration and work pace.  Finally, Ms. Greene indicated that many sedentary jobs require academic skills that surpass the SVP required for the work that Plaintiff has performed in the past.  (R. 155.)  These factors led Ms. Greene to indicate that if Plaintiff's testimony were credited, in view of "the entire picture, I believe that she could not" perform sedentary work.  (R. 154-55.)  In sum, the ALJ inappropriately rejected Plaintiff's testimony about her symptoms.  Hence, to the extent that the ALJ's conclusion concerning Plaintiff's RFC is premised on his unsupported finding that Plaintiff was not totally credible, such finding is invalid.

### 4.     Notice of Right to Representation

It is well settled that a plaintiff "has a statutory and regulatory right to be represented [at a social security disability hearing] should she choose to obtain counsel."  *Lamay v. Astrue*, No. 07-4205-cv, 2009 WL 982448, at *3 (2d Cir. April 14, 2009); *see also Desrosiers v. Astrue*, 274

Fed.Appx. 74, 75 (2d Cir. 2008). "The applicable statute and regulations state that, when notifying a [plaintiff] of an adverse determination, the Commissioner of Social Security . . . must notify the [plaintiff] in writing of (1) her options for obtaining an attorney to represent her at her hearing, and (2) the availability of organizations which provide legal services free of charge to qualifying [plaintiffs]." *Lamay*, 2009 WL 982448 at *3 (internal quotation marks omitted). Moreover, at the hearing itself, "the ALJ must ensure that the [plaintiff] is aware of her right to counsel." *Id.* (quoting *Robinson v. Sec'y of Health & Human Servs.*, 733 F.2d 255, 257 (2d Cir. 1984)). To ensure a full and fair hearing, the ALJ must ensure that Plaintiff knowingly and intelligently waived her right to counsel. *See Vaughn v. Apfel*, 98-CV-0025 (HB), 1998 WL 856106, at *4 (S.D.N.Y. Dec. 10, 1998).

Although Plaintiff received written notification of the right to counsel in a letter she received prior to the hearing,[5] the ALJ's discussion with Plaintiff at the hearing did not ensure that Plaintiff "was sufficiently informed of her right to counsel and knowingly and voluntarily waived that right at the hearing before the ALJ." *Lamay*, 2009 WL 982448 at *5. The transcript reflects the following exchange:

> ALJ: Ms Holiday you're here without a representative. Do you want to proceed?
> CLMT: Yes.
> ALJ: If, during the hearing, while we're going along, if I'm not explaining to you what's going on or you're getting confused or you fill [sic] uncomfortable, please let me know. I can always cancel the hearing and give—let you have a chance to go out and find a representative, if you think you need more –
> CLMT: I don't –

---

[5] Plaintiff received written notification as follows:

> You may choose to be represented by a lawyer or other person. A representative can help you get evidence, prepare for the hearing, and present your case at the hearing . . . Some private lawyers charge a fee only if you receive benefits. Some organizations may be able to represent you free of charge. Your representative may not charge or receive any fee unless we approve it.

(R. 31-33.)

ALJ:  -- [INAUDIBLE].
CLMT:  I don't believe I need one.  I understand.
ALJ:  Fine.  I'm going to go and enter into the record that you're proceeding, from the documentary standpoint and otherwise, without a representative.  When someone doesn't name a representative, I try to explain carefully what this is all about, because I think everybody has a right to know how important these hearings are.

(R. 140.)  The ALJ made no effort to confirm that Plaintiff actually understood his oblique reference to legal counsel as "a representative," or that counsel could represent her for a fee or on a *pro bono* basis.  Moreover, even though Plaintiff was approximately two hours late and admitted to having had "a beer" before the hearing, the ALJ did not bother to verify that Plaintiff was lucid and unclouded by alcohol.  Under these circumstances, the court cannot find that Plaintiff received adequate notice of her right to counsel.

### 5. Use of Teleconferencing Equipment

An ALJ may direct that the appearance of an individual at a social security disability hearing be conducted by video teleconferencing "if video teleconferencing technology is available to conduct the appearance, use of video teleconferencing equipment would be more efficient than conducting the appearance in person, and the administrative law judge does not determine that there is a circumstance in the particular case preventing use of video teleconferencing to conduct the appearance."  20 C.F.R. § 404.936(c).  An individual noticed for appearance at a hearing "will also be told if [the] appearance . . . is scheduled to be made by video teleconferencing rather than in person."  20 C.F.R. § 404.938(b).  The notice of hearing must indicate "that the scheduled place for the hearing is a teleconferencing site and explain what it means to appear at [the] hearing by video teleconferencing."  *Id.*  The notice must further provide plaintiff with directions on how to object and request an in person hearing instead.  *Id.*

The transcript hearing indicates that Plaintiff appeared via video teleconferencing equipment before an ALJ who presided from Virginia. (R. 35, 156-57.) The Court notes that Plaintiff was notified in advance of the hearing that video teleconferencing equipment would be used, and apprised of her right to object to the use of such equipment, as required by 20 C.F.R. § 404.938(b). (R. 35.) Even so, construing Plaintiff's *pro se* pleadings and papers "to raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474 , the Court finds that the use of teleconferencing equipment here may have been especially prejudicial, since it may have impaired the ALJ's ability to (1) observe the existence and severity of Plaintiff's lesions; (2) make proper credibility determinations; and (3) evaluate whether Plaintiff was intoxicated at the hearing, thus rendering her unable to knowingly waive her right to an attorney. On remand, in determining whether Plaintiff will be appearing at the hearing in person or via teleconferencing equipment, the ALJ should consider whether the need to assess these factors prevents the use of teleconferencing equipment in this case.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. This case is remanded to the Commissioner for further administrative proceedings consistent with this Order.

SO ORDERED

DATED:      Brooklyn, New York
            May 5, 2009

                                   _____/s/_____
                                        DORA L. IRIZARRY
                                     United States District Judge